May it please the Court, Albert Chow on behalf of the petitioner Mingguo Chen. Your Honors, this is an asylum case, and in this case there are two issues. The first is whether or not the petitioner testified credibly, and the second is whether or not the corroborating evidence in this case can independently establish the elements of an asylum claim. Now in terms of credibility, Your Honors, credibility must be assessed under a totality of the circumstances. And in this case, the petitioner is a person with a second grade education who can barely read or write, attempting to recall events that happened 17 plus years ago. And so we believe in this case that under totality of the circumstances that his testimony was credible. And I understand that there were a few, I guess, alleged inconsistencies pointed out by the Board, but we believe that he explained these inconsistencies. The first inconsistency... Well, one of them, if you could address, is the one about whether he had to get a permit to have a child. It seems like in a short period of time, at one point he says he needed a permit and then says he didn't need a permit. Can you explain that? Well, Your Honor, as I understand it in China, the family planning policy is taught essentially in school. And so what we're talking about is a person with a second grade education. I don't believe that he was really taught by the government about the family planning policy. And so I know that he said, you know, as Your Honor pointed out, he said that he needed one, then he said that he didn't. Essentially he's not sure, but I believe that the country report speaks that one needs a birth permit to have children in China. And he had a document showing that he actually paid for it. That's right. He was fined because he had a child essentially before marriage, which is a violation of the policy. And that's why he had to pay a fine for it. Right? I thought he had to pay a fine, A, because he got married when he was too young and B, because he didn't have the permit. Right. It's an early birth, early marriage. So they were married before while they were underage, and therefore because you're not married and underage, you cannot have a child. And so he had to pay a fine essentially for both. And that's what I'm saying in this case is that the documentary evidence can independently establish the elements of an asylum claim. I have a question at the outset. All right. He spoke, what was the language he spoke? I'm sorry? What language did he speak? I believe it was Fuching. Fuching. And there was a lot of laying over of the case to get a Fuching interpreter. Yes. But in the end, they didn't get a Fuching interpreter as I understand it, because it says at the very beginning, and the Mandarin interpreter is so and so. Right. So he was testifying to begin with in a language that wasn't his own. Is that right? Well, I believe that he said that his best language was Fuching. Right. But he said that he... And although they tried repeatedly to get a Fuching interpreter, it appears that they didn't. Is that accurate? That's correct. That is correct. Yes. Okay. Because there are points at which the interpreter doesn't seem to know what he's saying, and one wonders about whether any of the rest of this is ascribable to this language problem. Right. Right. Because Mandarin is not, quote-unquote, his best language, and so he has a very thick accent and such, and so I think that's probably why there were certain issues with communication at times. Okay. Go ahead. Yes. And so, you know, in this case, as I said, irregardless of his testimony, that the corroborating evidence can independently satisfy the elements of an asylum claim. He submitted multiple documentation showing that his wife had an abortion and also underwent a sterilization procedure, and especially the one that was the certificate of marriage and birth of mobile people. And the IJ objected to one of them because he couldn't explain what this floating population was and...  And even the board said... What difference did it make? I mean, there was no ambiguous language in the document itself. We all know what it said, but there was no indicia of unreliability for this particular document. It's simply that, well, if he couldn't explain it, then I can't accept it. And I don't think that that should be a reason to not accept the document, especially, again, he has a second-grade education. And that's why I submitted in my brief, I wrote about the country conditions, which essentially states that the government maintains restrictions on your ability to move and work and residence, but that people continue to migrate and they expanded these... Was one of the things they relied on the fact that he couldn't remember when he made the arrangements to come to the United States? Well, in that one, the very first question that says, when did you make the arrangements? Was that one of the ones that was relied upon by the IJBIA? It was. It was. And the very first question was when, and he answered 2006. And then he was asked, well, what month? And then he says, I don't remember. And then when pressed about it, that's when he said March or April. It wasn't just pressed. The IJ then says to him something like, we're going to have a problem if you can't remember as simple as that. When did you make arrangements? And this goes all the way through the transcript in terms of, I mean, if you ask me when I made arrangements to do something 12 years ago, there's no way I can answer that question. I agree with that, Your Honor. And as I said, he did say 2006 immediately. And then what he got caught on was what month in 2006, again, something that happened 10 plus years ago. And then he ends up saying something because he's been pressed. That's right. And that is what happened throughout the transcript. It's that he kept being pressed when he says, I don't remember. And then he gets pressed. And then he says, OK, well, whatever. And that's what he testified to. And again, as I said- When he ultimately testifies, were there inconsistencies in those testimonies when he ultimately did I do believe that he was somewhat inconsistent at times, but he explained those inconsistencies later. Which ones would you do you think were the inconsistencies that he explained? For example, he was asked whether he and his wife discussed the abortion before she had the abortion procedure. And at first he says no. And then later, I think he was asked never. And then he says, oh, well, yes, we did. But then he explained that it was because they he discussed it through his wife's family when she was already in custody. I also had the impression you were talking different time frames. I mean, they discussed it before, but they didn't discuss it just before. That's right. And and that was my understanding. Right. And that's why the question the first question was, did you ever this before? And he says no. And then she says never. And then he says, well, yeah, we did. But he had earlier discussed that they had discussed it. That's right. And in this at the time they first heard, it's not necessarily inconsistent because he said no as to whether it was before and then he said, well, we did discuss it, but he never gave it time. Right. And then it was explained. And also at that time, he was saying that his wife was already in custody. So I can see how we can misconstrue the abortion and the fact that she was already in custody awaiting the abortion. And therefore, he says, you know, he got confused. He didn't talk to her while she was in custody, but he talked to her before she was in custody and after she was in custody. I mean, that's my impression of what happened. So the IJ also said that it was somehow not plausible that they would have not registered the marriage for as long as they did. Right. And then that was one where he paid the fine for the early marriage, essentially for the government to recognize the marriage so that essentially they could give birth. But he was still underage at the time, so he had to wait at least another two years until he was of legal age to get a marriage certificate. And then as he testified to, well, I just got on with life and we just simply forgot. That wasn't an inconsistent. There wasn't an inconsistency. There was no inconsistency. That's correct, Your Honor. It was not. The judge simply says it doesn't make sense that you would do such a thing, you know. But again, you know, two years later, when when you're living your life and you're working, you're doing whatever it's, you know, and why would you go back and get a marriage certificate when, you know, when you're working and doing other things? And then with regard to this, this permit to have the child, he says, I was fine for having a birth without a permit. Why do you need a permit? Well, because the government says so. But why? I don't know. Well, how would he know? I mean, I agree. I had to be admitted to the Ninth Circuit to practice. Why? I don't know. I just did it because you told me to. Right. Right. And so I believe that overall, I think he was credible, you know, especially, again, in the light of the fact that he's a second grade education, things that happened 10 plus some and sometimes 17 years ago. I believe that overall, this testimony is credible. Did he actually say they didn't need a permit or he says they didn't tell me that? And then he says, we didn't even you didn't know, was it something you were supposed to do? We did not apply. You don't have to apply. Is that the point at which they say he was said he didn't need the permit? Because what he actually said is you don't have to apply. Right. And that's I think that's what they construed as not needing a permit when really he was kind of unsure. And again, that's because he had very low level of education. He was never taught. Basically, we did not know anything about government policy. The parents wanted to see their grandchild. Right. Right. OK. Well, I have 18 seconds left, so I will reserve that. I can reserve your 18 seconds. I'm really going to be tough about time. Go ahead. Good morning. May it please the court, Aaron Nelson, for the respondent, the attorney general. There's so much here, I'm not sure where to start. Can I ask you a question? So because we can walk through each of these if we need to, but the implausibility, I've seen inconsistencies are a little stronger. But how much deference do we give to implausibilities for the IJ? Are you referring to implausibility? Well, as I understand it, the IJ said, look, I just find it implausible that you didn't register your marriage until eight years later. Your Honor, if we were here and that were the crux of our case, I would have a very hard time saying that the adverse credibility should be upheld based on an implausibility about why a rural peasant didn't necessarily register his marriage timely. Or didn't know what the floating population meant. Or that his wife had the same photograph on two different documents. None of that makes much sense. That's a slightly different line of questioning, I think. Well, no, those are all the implausibility points. Right. The documents come sort of after the credibility as an independent analysis. I guess I... Well, I mean, that's one way to look at them. But another way to look at them is that when you're looking at the record as a whole, if you have documents that there's no reason not to believe that they ought to be factored into the overall credibility determination. So the, well, you know, the board decision says independent of the adverse credibility determination. I understand that. Okay, but what about not independent of the adverse credibility finding? What about as part of the adverse credibility finding, the fact that you have documents that there's no reason to discount ought to go into the credibility determination? Well, the way I look at the documents is that do they make his case? But why do they have to independently make his case? Why can't they simply help somebody who is actually trying to be fair about whether this man is telling the truth or not, would consider the various kinds of problems that we've been talking about, about his education, about the language, about the fact that he was frankly being bullied by this judge to say, remember things that nobody would ever remember. And that he had these documents. Why don't those all go together? Well, I believe there are two sort of independent lines of analysis. And Your Honor, if I might... I'm asking you why there are independent lines of analysis. Why don't documents that are on their face comport with a story and that there's no plausible reason to discount part of the credibility determination rather than pushed off to the side until you've already decided he's not credible? Okay, let's look right at the documents. The three documents at issue are essentially reflect that he's married, he's part of a He can't describe when he got him. And that his wife had the abortion that he said she had. So document number two reflects that she had an abortion. Document number three reflects that she was sterilized. So let's just look at those documents. What do they tell us? They tell us that his wife... Tell us that some parts of the story are true. They tell us that his wife had an abortion and that she was sterilized. They give no context. It doesn't say forcibly sterilized. That's true. But they do tell you that some parts of his story are true. But if any parts of his story were false, that's enough to support an adverse credibility finding, right? We believe so. And what I'd like to know is what, because it does seem like, and I appreciate your concession up front that some of these are not independently the strongest grounds. What are the strongest grounds? Why are we here? What would support the adverse credibility finding? So as an initial point, in the record, 41 times he's asked a question. Not questions with compound sentences, not difficult questions. He's asked a question and he gives some version of, I can't recall, I don't know, it was many years ago. 41 times he says that. And yes, and it was many years ago. And if somebody asks you when you made a plan to do something 11 years ago, you know when you did it, but do you know when you planned it? If I were living in a regime which forcibly aborted my unborn child and I was asked, when did you decide to leave that awful regime? I would say the day that that happened, I knew I was getting out of there. Well, maybe it wasn't the day that he asked. Where does the inconsistency, I think we've gotten diverted from, where's the inconsistency there? He says, I don't know, 41 times. And then what? He comes back and says. So the inconsistency is, so with regard to the events that happened in August of 1999, he's working outside of his village. His wife is in hiding, although she's working in plain sight in a factory, his parents are kidnapped. He says they're kidnapped. I don't see anything in the country reports that this is a normal procedure for the Chinese government to kidnap. But, but is there, did he ever say they weren't kidnapped? I mean, where's the inconsistency? So the inconsistency is, did you speak with your wife, um, about the abortion before she had the abortion? He says, yes. Then he says, no. When did you learn about the abortion? Wait, is that accurate? I thought that he was asked, uh, did you speak with her before she had the abortion? And he said, no. And then they said, did you ever have any conversations? And he said, yes. That doesn't strike me as inconsistent, but maybe I don't understand. You know, I've read the, I've read the testimony over and over. I just, it is so muddled and I've, I, I find that he says, I mean, that, that's part of the problem. Like I, one question is whether we should give deference to the petitioner because he didn't have, uh, you know, the proper translator, but at a minimum you can't take the muddled ness that came out of that and use that against him. I mean, I think, I think that's the baseline. Whether he gets more credibility for that, that's a separate question. I'm just wondering, and the one, I mean, whether he had, whether he, uh, a permit was required, seems to be your strongest argument on a potential inconsistency. Would you agree with that? What's your strongest inconsistency on the record? Yeah, I'm, I'm willing to anchor it on any of the inconsistencies in our brief. You don't want to pin it down. But some of the inconsistencies, you know, weren't at all inconsistent. I'm a little perplexed that, that it feels like the panel is going in a direction of giving deference to, um, the petitioner when the standard of review is actually quite the opposite. I'm totally with you. I'm totally with you, but I want to see an inconsistency and that's what I'm not. He had to get a permit. He did not have to get a permit. But he didn't say he didn't have to get a permit. He said he didn't have to apply for a permit. That's not the same thing. When did he learn about the abortion? He says he got a phone call from his wife's family. He says that there was an exchange in real time, his parents release, when she submitted for the abortion. He then says that he learned about it later. He then also says that he rushed from the fisheries where he was working the same day. He doesn't say the same day, but if you read what he says, he rushed back to the hospital but by the time he got there, it was already done. Then he says, he also at another point, he also says, I learned about the abortion after I returned to the village. So, um, those, you know, that's a pretty good inconsistency. I think, you know, and that is the crux of your honor. I just feel like this is not, these aren't trivial. This isn't, this isn't, um, cherry picking. Here's the problem to his. Some of it is, some of it is trivial. And I, at least I just speak for myself. I'm trying to sort through it and figure out where we can hang our hat on this because I don't, I'm not bought in on the implausibilities, but if the inconsistency that you're saying that he gave different answers, I think you're right. He gave different answers. And, and, you know, as I started out saying some of the implausibilities, if that's all we were here as a standalone, um, we'd be, we'd have a much weaker case, but it fills out, it fills out the picture of, um, his narrative, which is that his family unit, you know, this is a very human impulse to protect your family unit and your right to reproduce. Um, that's why what he did with registering the marriage, he registers the marriage four months before he decides to leave. Um, that's why questions about his travel plans, um, you know, he, he says that he, he started his travel plans in 2006. It was partly because he was planning to leave. He, at one point he said, he said it was because the kids had to go to school and, and also because he was planning to leave. But I don't know why that impugns it. Well, he's also asked, he's also asked, uh, about the sojourn and he spends four months in Peru and he's, and he's asked, did you apply for asylum in Peru? So ostensibly he's fleeing a brutal regime. He's free in Peru. Um, and he doesn't apply for asylum. He stays there four months and he's asked, why didn't you apply for asylum? And he says, that's not where I wanted to go. That's a different line of, that's a different, this isn't about unsophisticated. You know, if you're fleeing something, my wife has been forcibly sterilized. You know, you, you, you exhale when you get in, get to Peru. Actually, what it suggests is that his motivations were different. That at the end of his questioning, he says, there's a question, something like, um, would you like to go back to China? What would happen if you got to? I don't like China. He said, I don't like, I don't like it. Any other reason? I don't like it. That's it. I have a couple other questions very quickly. I mean, I must say that my concern about this transcript overall is A, the language B, the fact that the IJ, you know, and we have some cases about this, was inappropriately, A, intervening. He's basically took over the whole thing. And B, bullying him into, I mean, I read a piece before. Here's another piece. He says, when did they come and arrest your parents? As I said, August 1999, the exact date, I cannot remember why. I mean, you must have some idea. Was it at the beginning of the month, the middle of the month, the end of the month? You must have some idea. You know, and then he says, I would say in the middle of the month. Again, when things happened 11 years ago, even traumatic things, the notion that you can remember the exact date. I can remember things exceedingly clearly that happened, and I can't tell you within five years when they happened. So this insistence on him having to, I mean, the judge had obviously decided at the outset that he wasn't going to believe anything he said. I mean, and that makes you. I respectfully disagree, and I would just say two things that were over time, I believe. Yes. Yeah, we're in negative time. I would just say that he was represented ably by counsel. He had the benefit of procuring documents over many years. His merits hearing was continued. Now, yes, that could lend itself toward a foggy memory, but it also, he could have prepared. He could have sat down. He had time, and it was never been, the issue of interpretation has never been raised either to the board or to this court. But it's clear on the record, is it not? It's not. It hasn't been raised in the briefs, and neither has badgering of the immigration judge, which And it was also clear on the record that they were mistranslating it. At one point, she says that he was on a snake farm. And then somebody says, a snake farm? And then she goes back and says, oh, no, no, it's a sea cucumber farm. And there's a fair amount of that. But that's not the inconsistency. No, but it's an explanation for the confusion. And it's, well, perhaps. But it's also never been raised in the brief. OK. All right. Thank you very much. You have 16 seconds, and that's what you're getting. Go ahead. I would just like to say for the final point, to Judge Nelson's point, it is permissible to, I guess, find adverse credibility on only one inconsistency. But everything must be evaluated under a totality of the circumstances. Yes. OK. All right. Thank you very much. The case of Chin v. Barr is submitted. The next case, Coey v. Barr, has been submitted on the briefs.
judges: Berzon, Nelson, Lee